IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION



| UNITED STATES OF AMERICA, | § | |
|---|---|---|
| Plaintiff, | § | |
| v. | § | 2:21-CR-51-Z-(2) |
| ALEJANDRO ALARCON LOPEZ, JR | § | |
| Defendant. | § | |

### MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Alejandro Alarcon Lopez, Jr.'s ("Lopez") Motion to Suppress (ECF No. 44) ("Motion"). Defendant moves to suppress all evidence that the Government seized during a search of his vehicle following a canine free-air sniff. Lopez posits law enforcement did not have probable cause to search the vehicle he was driving because the enforcement canine falsely alerted to the presence of narcotics. For the reasons stated below, the Court **DENIES** Defendant's Motion.

#### BACKGROUND

On June 8, 2021, DPS Trooper Richard Pacheco observed Lopez and co-defendant Timothy Ruben Osorno ("Osorno") speeding in a construction zone while heading east on Interstate 40. ECF No. 47 at 3-4. Trooper Pacheco subsequently pulled over Lopez and Osorno for the traffic violation. While questioning them about their travel, Trooper Pacheco noticed inconsistencies in their stated reasons for travel. *Id.* at 4. Lopez stated he and Osorno were headed to Texas "to chill with friends," but he did not know where they were travelling. *Id.* Osorno claimed they were traveling to South Carolina, where a third party would provide more specific instructions. *Id.* Trooper Pacheco determined that the inconsistent stories and behavior were

consonant with drug trafficking, and he requested Osorno's consent to search the vehicle. *Id.* Osorno declined, and Trooper Pacheco notified Lopez and Osorno that he would be calling a drug detection-canine to the scene. *Id.*

DPS Trooper Shannon Tanck and Canine Selly arrived on the scene and performed a free-air sniff on the vehicle. Upon approaching the driver's side of the vehicle, "Selly showed multiple odor responses" on her first pass. *Id.* at 5. As Trooper Tanck and Canine Selly approached the rear driver side door, Canine Selly began sniffing heavily at the taillight area, and then began to scratch at the taillight. *Id.* Troopers Tanck and Pacheco deemed this final alert sufficient to establish probable cause to conduct a search of the vehicle. *Id.* Trooper Pacheco's search of the vehicle revealed seven bundles of narcotics hidden in the foam lining of the back seat. *Id.* The bundles weighed seventeen pounds. *Id.* Testing at the DEA South Central Laboratory confirmed that the substance in these bundles was fentanyl. *Id.*

Officers conducted a full inventory of the vehicle and the property inside. *Id.* at 6. This inventory revealed a receipt in Lopez's wallet which listed a purchase for $792.65 worth of THC and marijuana products from "Herb 'N Vibes" located in Tulare, California. *Id.* The date on the receipt confirmed the purchases were made days before the events at issue in Lopez's Motion to Suppress. *Id.* During the booking process, Osorno admitted to smoking marijuana a week prior to the traffic stop, and Lopez admitted to using marijuana a day before the traffic stop. *Id.*

On June 9, 2021, Magistrate Judge Lee Ann Reno issued a Complaint and Arrest Warrant. ECF Nos. 1 and 5. Lopez was arrested on June 14, 2021. ECF No. 8. A federal grand jury indicted Lopez on June 24, 2021 for violations of (1) 21 U.S.C. § 846, Conspiracy to Distribute and Possess with Intent to Distribute 400 Grams or More of Fentanyl, and (2) 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), Possession with Intent to Distribute Fentanyl. ECF No. 29.

On October 15, 2021, Lopez filed his Motion to Suppress the narcotics seized during the June 8, 2021 traffic stop. ECF No. 44. The Government filed its response on October 29, 2021. ECF No. 47. On December 1, 2021, the Court held a hearing on the Motion to Suppress.

**LEGAL STANDARD**

The Fourth Amendment protects individuals against unreasonable searches and seizures. *United States v. Roberts*, No. 2:17-CR-129-D, 2018 WL 1740076, at *4 (N.D. Tex. Apr. 11, 2018). Evidence derived from an unreasonable search or seizure generally must be suppressed under the "fruit-of-the-poisonous-tree doctrine." *United States v. Alvarado-Zara*, 782 F.3d 246, 249 (5th Cir. 2015) (citing *United States v. Cotton*, 722 F.3d 271, 278 (5th Cir. 2013)). "Warrantless seizures are 'per se unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions.'" *Id.* (quoting *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014)).

"The decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996). Even a pretextual traffic stop does not violate the Fourth Amendment, so long as the officer making the stop has probable cause to believe a traffic violation has occurred. *United States v. Escalante*, 239 F.3d 678, 680-81 (5th Cir. 2001). Once a legal traffic stop has concluded, "a temporary, warrantless detention of an individual constitutes a seizure for Fourth Amendment purposes and must be justified by reasonable suspicion that criminal activity has taken or is currently taking place; otherwise, evidence obtained through such a detention may be excluded." *United States v. Garza*, 727 F.3d 436, 440 (5th Cir. 2013). "Under the two-part *Terry* reasonable suspicion inquiry, [the court asks] whether the officer's action was: (1) 'justified at its inception'; and (2) 'reasonably related in scope to the circumstances which justified the interference in the first place.'" *United*

3

*States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (quoting *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968)). "Reasonable suspicion requires more than merely an unparticularized hunch, but considerably less than proof of wrongdoing by a preponderance of the evidence." *Id.*

Free-air sniffs by narcotics-detection dogs are so minimally invasive that they do not constitute a "search" or a "seizure" for Fourth Amendment purposes. *United States v. Place*, 462 U.S. 696, 707 (1983). "A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment." *Illinois v. Caballes*, 543 U.S. 405, 409 (2005).

A warrantless search of an automobile is valid under the Fourth Amendment when a police officer has probable cause. *Almeida-Sanchez v. United States*, 413 U.S. 266, 269 (1973). A police officer has probable cause to conduct a search when the facts available would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present. *Florida v. Harris*, 568 U.S. 237, 243 (2013). An alert by a narcotics-detection dog provides probable cause to search. *Id.* at 248; *United States v. Sanchez-Pena* 336 F.3d 431, 444 (5th Cir. 2003).

ANALYSIS

Lopez argues the warrantless search of Osorno's vehicle by Troopers Pacheco and Tanck violated his Fourth Amendment rights. Specifically, he contends that (1) Trooper Pacheco unreasonably detained him in violation of the Fourth Amendment, (2) Trooper Tanck's and Canine Canine Selly's training, certification, and field records indicate that an alert by Canine Selly is unreliable and is not sufficient to provide probable cause for a search. Assuming Canine Selly is unreliable, and her alert was a false positive, Lopez further argues Troopers Pacheco and Tanck lacked probable cause for a search. ECF No. 44, at 5. As a result, he asks for suppression of the 17 pounds of fentanyl seized from the vehicle. *Id.*

The Government contends Troopers Pacheco and Tanck had probable cause to search Osorno's vehicle based on "an alert from a reliable drug-detection dog." ECF No. 47 at 1. The Government asserts the Troopers could trust Canine Selly's alert based on her training and field-work track record, and the dog could have alerted to residual odors of narcotics the defendants possessed before the traffic stop. *Id.* at 9.

### A. Legality of the Initial Traffic Stop

Though the Defendant did not contest the legality of the initial traffic stop, the Court will make a finding on this issue. Where an officer has probable cause to believe that a traffic violation has occurred, he may reasonably stop the vehicle. *See Whren*, 517 U.S. at 810. Trooper Pacheco testified — and Lopez did not object — that he observed Lopez travelling 70 miles per hour in a 65 mile per hour construction zone. Based on this testimony, the Court finds that Trooper Pacheco's decision to stop the vehicle was reasonable and legal under the Fourth Amendment. Though Defendant did not argue the legality of the traffic stop in his motion, Defendant argued during the hearing that Trooper Pacheco's stop of the vehicle was pretextual and therefore impermissible. Defendant misstates the law. Supreme Court and Fifth Circuit precedent is well-established that pretextual stops do not violate the Fourth Amendment, so long as the officer making the stop has probable cause to believe a traffic violation has occurred. *See Escalante*, 239 F. 3d at 680-81.

### B. Reasonable Suspicion for Detention

Defendant argues that he was unreasonably detained in violation of the Fourth Amendment while Trooper Pacheco waited for a canine unit. In accordance with *Terry v. Ohio* and its progeny, the Court must determine whether Trooper Pacheco's action in detaining Lopez was (1) "justified at its inception" and (2) "reasonably related in scope to the circumstances which justified the interference in the first place." *Lopez-Moreno*, 420 F.3d at 430 (quoting *Terry*, at 19-20).

### *1. Trooper Pacheco's detention was justified at its inception.*

Defendant failed to timely argue in his motion, but later argued during the hearing that Trooper Pacheco lacked reasonable suspicion to detain Defendant after the stop. Defendant offers only conclusory arguments that the totality of the facts and circumstances surrounding Trooper Pacheco's initial traffic stop are insufficient for an officer to reasonably suspect Defendant was trafficking narcotics. The Court disagrees.

For a detention to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle. "The Supreme Court has stated that in making a reasonable suspicion inquiry, a court must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Johnson*, 2006 WL 1041148, at *3 (N.D. Tex. Apr. 20, 2006) (Fitzwater, J.) (quoting *Lopez-Moreno*, 420 F.3d at 430).

Here, the Court finds that the totality of Defendants' words and actions were sufficient for Trooper Pacheco to reasonably suspect that Defendants were trafficking narcotics and to subsequently detain the defendants after the initial traffic stop concluded. Specifically, the Court finds the following evidence relevant and persuasive. Trooper Pacheco testified during the hearing that:

- Lopez and Osorno told Trooper Pacheco conflicting stories when he questioned them about their travel plans;

- Lopez initially hesitated when asked about their travel plans, and then stated he and Osorno were travelling from California to Texas to "chill with friends." However, Lopez could not state with specificity where they were headed — even though he was driving;

6

- Lopez stated he was travelling with only $200, a statement which Trooper Pacheco testified aroused his suspicion, as $200 is a small amount of money to carry for a cross-country trip;

- Lopez stated that he and Osorno had travelled all night. Trooper Pacheco testified that in his training and experience, narcotics traffickers often "travel from point A to point B as quickly as possible" in order to avoid detection;

- When Trooper Pacheco began to question Osorno, he noticed that Osorno was exhibiting signs of nervousness, despite having told Osorno he was only issuing a warning for the traffic violation;

- Osorno told Trooper Pacheco they were headed for South Carolina, where they were to await further instructions from an unidentified third party;

- Lopez and Osorno were travelling along Interstate-40, a route, Trooper Pacheco testified, known by law enforcement as a notorious corridor for narcotics trafficking; and

- Finally, Defendant was wearing a t-shirt emblazoned with the name "PABLO" and a painted-style portrait of the infamous drug cartel kingpin Pablo Escobar.

Accordingly, the Court finds that Trooper Pacheco, or any other reasonable law enforcement officer, could have reasonably suspected Defendant and the other occupant of the vehicle were involved in trafficking narcotics based on the totality of the facts and circumstances known to Trooper Pacheco at the conclusion of the initial traffic stop. Therefore, Trooper Pacheco's detention subsequent to the initial traffic stop was justified at its inception."

### 2. *Trooper Pacheco's actions were reasonably related in scope to the circumstances.*

Under *Terry*'s second prong, the Court considers whether Trooper Pacheco's actions after stopping the vehicle "were reasonably related to the circumstances that justified the stop, or to dispelling his reasonable suspicion developed during the stop." *United States v. Brigham*, 382 F.3d 500, 507. "An officer's subsequent actions are not reasonably related in scope to the circumstances that caused him to stop the vehicle if he detains its occupants beyond the time needed to investigate the circumstances that caused the stop, unless he develops reasonable suspicion of additional

criminal activity in the meantime." *United States v. Pack*, 612 F.3d 341, 350 (5th Cir. 2010), *modified on other grounds*, 622 F.3d 383 (5th Cir. 2010).

If, however, "the officer develops reasonable suspicion of additional criminal activity . . . he may further detain [the] occupants [of the vehicle] for a reasonable time while appropriately attempting to dispel this reasonable suspicion." *United States v. Andres*, 703 F.3d 828, 833 (5th Cir. 2013) (alterations in original) (quoting *Pack*, 612 F.3d at 350). "Reasonable suspicion exists when the detaining officer can point to specific and articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the search and seizure." *United States v. Estrada*, 459 F.3d 627, 631 (5th Cir. 2006). "The determination . . . must be made based on the totality of the circumstances and the collective knowledge and experience of the officers." *Id.* at 631-32 (citation omitted).

During the suppression hearing, Defendant challenged the *questions* Trooper Pacheco presented to Lopez and Osorno during the traffic stop. Specifically, Defendant argues it was inappropriate to ask questions about their employment or marital status, as these questions were unrelated to the purpose of the stop — and such questions were utilized to prolong the stop until the arrival of the canine unit in violation of the Supreme Court's holding *Rodriguez v. United States*. 575 U.S. 348 (2015).

In *Rodriguez,* an officer pulled Rodriguez over for driving on the shoulder — a traffic violation. *Id.* at 348. The officer conducted the initial traffic stop and then concluded the stop by issuing a warning. *Id.* The officer did not develop reasonable suspicion during the initial traffic stop, but detained Rodriguez for seven minutes after the traffic stop had already concluded while waiting on a second officer to arrive. *Id.* After the second officer arrived, the officer conducted a

free-air sniff with the officer's canine. *Id.* The Court held the detention was unconstitutional because the officer extended the stop to develop reasonable suspicion or probable cause. *See id.*

Here, Defendant misunderstands the application of both *Rodriguez* and *Pack*. A law enforcement officer may ask questions on subjects unrelated to circumstances that caused the stop, so long as these unrelated questions do not *extend* the duration of the stop. *Pack*, 612 F.3d at 350. Trooper Pacheco asked questions and received the answers to those questions during the regular course of the initial stop. The preponderance of the evidence supports the Government's argument that Trooper Pacheco developed reasonable suspicion of additional narcotics trafficking during the initial stop. This is distinguishable from the facts in *Rodriguez* where the officer developed reasonable suspicion after the stop had concluded.

The second prong of *Terry*, requires Trooper Pacheco's actions after the initial stop, including the canine free-air sniff, to be reasonably related to the circumstances that justified the detention. *See Brigham,* 382 F.3d 507. The circumstances that justified Trooper Pacheco's detention involved facts and circumstances related to trafficking narcotics. Therefore, Trooper Pacheco's request for a canine to conduct a free-air sniff to detect the odor of illegal narcotics is reasonably related to the circumstances that justified the detention. The Court finds that the troopers did not violate Defendant's Fourth Amendment rights either by detaining Defendant or by the subsequent canine free-air sniff.

### C. Reliability of the Canine

Next, Defendant avers that Canine Selly's alert was unreliable and therefore provided insufficient probable cause for Troopers Pacheco and Tanck to perform a search of Osorno's vehicle. Probable cause exists when the facts available to law enforcement would "warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." *Harris*, 568 U.S. at 243 (citing *Texas v. Brown*, 460 U.S. 730, 742 (1983)). In evaluating whether

9

this standard is met, courts look to the totality of the circumstances, rejecting "rigid rules, bright-line tests, and mechanistic inquiries in favor of a more flexible, all-things-considered approach." *Id.* at 244. A narcotics-detection dog's alert provides probable cause when "all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime. *Id.* at 248. "[E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." *Id.* at 247. The Fifth Circuit has repeatedly affirmed that alerts by a narcotics-detection dog are sufficient to provide probable cause for a search. *Sanchez-Pena*, 336 F.3d at 444. Probable cause can be established when a dog alerts on only the residual odors of a drug. *United States v. Outlaw*, 319 F.3d 701, 704 (5th Cir. 2003) (citing *United States v. Johnson*, 660 F.2d 21, 23 (2d Cir. 1981) (rejecting appellant's argument that probable cause is not established when a dog alerts only on the residual odors of an illegal narcotic)).

In *Harris*, the Supreme Court held that a free-air sniff by a narcotics-detection dog provided probable cause to search the defendant's vehicle because training and testing records supported the dog's reliability in detecting drugs, and the defendant was unable to contradict or discredit the evidence. In that case, officers performed a free-air sniff of defendant's vehicle after he refused to provide consent for a search. *Harris*, at 240. The canine alerted to the driver's-side door, and officers concluded they had probable cause to conduct a search. *Id.* The search did not reveal any drugs that the canine was trained to detect, but it did uncover pseudoephedrine pills and other ingredients needed to cook methamphetamine. *Id.* at 241 The district court deemed Florida's showing persuasive because the dog completed a 120-hour program in narcotics detection, obtained a certificate from an independent organization, and continued to satisfy training requirements established by the Florida Sheriff's Office. *Id.* at 248.

The district court rejected defendant's argument that because the vehicle search did not reveal any substances the dog was trained to detect, the dog's alerts must have been false. *Id.* at 249. Critical to the court's analysis was the fact that the defendant routinely cooked and used methamphetamine, making it likely that the dog responded to odors that the defendant had transferred to the driver's-side door. *Id.* As the court stated, a "well-trained drug-detection dog *should* alert to such odors; his response to them might appear a mistake, but in fact is not." *Id.* (emphasis in original).

In *Sanchez-Pena*, the Fifth Circuit rejected the defendant's argument that the narcotics-detection dog and its handler were inadequately qualified to conduct the sniff so that the dog's alert could not provide probable cause to search his vehicle. *Sanchez-Pena*, at 444. A canine unit performed a free-air sniff around defendant's vehicle following the officers' determination that defendant was taking a suspicious route and similar vehicles had been used to smuggle narcotics in the gas tank. *Id.* at 435. The canine alerted to the gas tank of the vehicle, and the subsequent search revealed 195 pounds of marijuana. *Id.* The Circuit court re-affirmed that alerts by drug-detection canines provide probable cause to search. *Id.* at 444. Further, the court affirmed that the prosecution need not show a canine's training and reliability if probable cause is developed on site as a result of a canine free-air sniff. *Id.*

Ultimately, the Circuit court upheld the district court's findings that the search was lawful based upon probable cause developed by the canine alert. *Id.* Though the court determined that it need not address the defendant's challenge to the qualifications of the canine and its handler, the Circuit court held that evidence showing the dog and its handler completed Police Narcotic Detector School and the handler was a certified canine handler "was sufficient proof of his training to make an effective alert." *Id.*

In *Outlaw*, the defendant ("Outlaw") argued that that the denial of his motion to suppress was erroneous because the canine alert was unreliable. *Outlaw*, at 703. A canine free-air sniff of a commercial Greyhound bus revealed Outlaw was attempting to smuggle phencyclidine ("PCP") in his luggage. *Id*. The Fifth Circuit held it was "undisputed" that the canine unit successfully completed all standard training procedures, and that the canine was certified to detect a variety of narcotics including marijuana, cocaine, heroin, and methamphetamine. *Id*. at 704. In upholding the district court's finding that the canine alert was reliable, the Court held the alert was sufficient to sustain the border agent's reasonable suspicion and support probable cause, despite the dog's inability to detect PCP. *Id*.

Here, Defendant argued in the hearing that Trooper Tanck's and Canine Selly's training, certification, and field records indicate that an alert by Canine Selly is unreliable and is not sufficient to provide probable cause for a search. These arguments fail based upon the controlling law and the facts before this Court.

Trooper Tanck's and Canine Selly's training, certification, and field records do not support Lopez's assertion Canine Selly is unreliable. Instead, Trooper Tanck's and Canine Selly's records prove the exact opposite. Like the canine units in *Harris*, *Sanchez-Pena*, and *Outlaw*, Trooper Tanck and Canine Selly successfully completed training and certification requirements. Canine Selly was first certified as a drug detection canine in February 2020, and she completed her last annual certification on April 29, 2021. ECF No. 47 at 2. Trooper Tanck testified that Canine Selly has never failed a certification attempt. These certifications employ single-blind testing. Single-blind testing involve scenarios where the handler does not know where contraband is hidden or even if its present. ECF No. 47 at 3. This testing prevents the handler from cuing the dog to alert. *Id*.

Together, Trooper Tanck and Canine Selly perform weekly training scenarios and bi-monthly performance evaluations. *Id.* Trooper Tanck testified he and Canine Selly are required to train pursuant to DPS procedures and guidelines for a minimum of eight hours a week and conduct at least ten "unknown hides" where the canine unit is unaware of the presence or location of any contraband. Further, the evidence shows Trooper Tanck and Canine Selly passed a bi-monthly evaluation just nine days before the search challenged here. ECF No.47 at 2-3.

In total, Canine Selly has completed over 1,000 training activities. *Id.* She has never received an unsatisfactory rating. *Id.* In the field, Canine Selly performed 73 free-air sniffs, alerting 66 times. *Id.* Of those 66 alerts, 49 culminated in searches uncovering drugs and 56 culminated in searches uncovering drugs or other contraband such as drug paraphernalia or large amounts of currency. *Id.* These numbers result in a reliability rating of 74% and 84% respectively. *Id.*

Defendant's expert witness, Jerry Potter, testified that Trooper Tanck and Canine Selly acted in accordance with their training and procedures. Though Mr. Potter takes issue with Trooper Tanck's calculation and logging of hours in their weekly training records, Trooper Tanck testified that he and Canine Selly train in accordance with DPS protocols. Defendant did not offer any credible evidence that Trooper Tanck was improperly calculating their training hours in violation of DPS policy. Based upon the training evidence, the Court finds Canine Selly is reliable.

Defendant further argued in the hearing that long-standing canine training protocols established by the DPS violate his constitutional rights because Defendant questions, without support, the reliability of DPS canine training methods. Relying on the testimony of his expert witness, Defendant argues the use of pseudo-narcotics in their training makes Canine Selly susceptible to detecting odors of substances that "are not controlled substances." Defendant's arguments are unpersuasive.

Neither Defendant nor his expert witness offered proof that the pseudo-narcotics created, certified, and distributed by the DPS for canine training somehow compromise the integrity of a canine sniff. Neither did they offer evidence that the chemical compounds that compose pseudo-narcotics result in false or unreliable alerts by DPS canines.

Further, canine alerting behavior is particular to the dog. Because each dog alerts in a different way, the dog's behavior must be interpreted by the handler. *United States v. Masterson*, 450 Fed.Appx. 348, 349 (5th Cir. 2011). Trooper Tanck testified that he is in the best position, as Canine Selly's handler, to assess her behavior when conducting a sniff. On the Government's cross-examination of Mr. Potter, he agreed with Trooper Tanck's testimony. As such, the testimony of Jerry Potter is *irrelevant*, and the testimony of Trooper reflects that Selly properly alerted to the odor of some narcotic present in or on Osorno's vehicle. *See id.*

Defendant argued during the hearing that Canine Selly is not trained to detect fentanyl and therefore Trooper Tanck must have queued the canine to alert. Canine Selly's inability to detect fentanyl is irrelevant. In the case law cited above, the Supreme Court and the Fifth Circuit held that probable cause to search a vehicle based on a canine sniff exists, even when the dog alerts to a substance that is not uncovered in the search. *See Harris*, at 249; *see also Outlaw*, at 704. Here, the Troopers determined that Canine Selly's alert provided probable cause to conduct a search of Osorno's vehicle. The search uncovered 17 pounds of fentanyl hidden in the foam insulation of the vehicle's back seats. ECF No. 47 at 5.

Additionally, the evidence shows Lopez purchased over $700 worth of THC and marijuana products in California just days before the stop. Trooper Pacheco testified that both Osorno and Lopez admitted to smoking marijuana within the week before the stop. He also testified that Lopez admitted to smoking marijuana the day before the stop. *Id.* at 6.

Like the defendant in *Harris*, whose cooking and use of methamphetamine likely resulted in the transfer of odors to the driver's-side door of his vehicle, Lopez's and Osorno's use of marijuana likely resulted in the transfer of marijuana odor to the driver's side of Osorno's vehicle. Canine Selly likely alerted due to the presence of residual odor of marijuana transferred to Osorno's vehicle. Such an alert based on residual odor is sufficient to establish probable cause for a search. Canine Selly, "a well-trained drug-detection dog[,] *should* alert to such odors." See *Harris*, at 249. Upon considering Trooper Tanck's testimony, Canine Selly's training records, and the relevant law and facts, the Court finds that Canine Selly's alert was reliable. Thus, the troopers had probable cause to lawfully search Defendant's vehicle.

## CONCLUSION

For the reasons outlined above, the Court finds (1) Trooper Pacheco had probable cause to conduct the initial traffic stop; (2) Trooper Pacheco lawfully detained Defendant while waiting for a canine unit; (3) Canine Selly's alert was reliable; and (4) Trooper Pacheco and Trooper Tanck's search of Osorno's vehicle and subsequent seizure of 17 pounds of fentanyl was lawful. The Court finds Defendant's Motion to Supress should be and is hereby **DENIED**.

**SO ORDERED.**

December 2, 2021.

MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE